UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                                              :    **SEALED**
UNITED STATES OF AMERICA                      :    **INDICTMENT**

        - v. -                                :    14 Cr.

KEVIN LOWE,                                   :
DAVID MOODY,                                  :
RASHAWN WHIDBEE,
    a/k/a "Ra-Ra,"
ROBERT WILLIAMS,                              :
    a/k/a "Crusader Rob,"
DONALD CARR,                                  :
    a/k/a "Buster,"                           :
GEORGE BARROW,
    a/k/a "Coco,"                             :
BRADLEY MITCHELL,
ELIJAH PINCKNEY,                              :
EVELYN WHITE,
CEDRIC WHITE,                                 :
    a/k/a "Sin,"
SHEILA CARTER,                                :
RAVELO MANZANILLO,
    a/k/a "Grande,"                           :
JONATHAN HUERTAS,
OLGA MENDOZA DELAROSA,                        :
BRYAN RIVERA,
SAMANTHA LIVINGSTON,                          :
BRIDGET HIGGINS,
DAVID STEWART,                                :
    a/k/a "Cash Money,"
    a/k/a "Pork Chop,"                        :
VOKART ALSAIDI,
KENRICK CHANDLER,                             :
    a/k/a "Booby,"
DARRYL BRATHWAITE,                            :
THEODORE ROOSEVELT JOHNSON,
    a/k/a "Top,"                              :
WALEED ALSAIDI,
RONALD CARR,                                  :

                Defendants.                   :

                                              :

- - - - - - - - - - - - - - - x

COUNT ONE
**(Conspiracy to Distribute Narcotics)**

The Grand Jury charges:

**Introduction**

1.    From in or about January 2011 up to and including
in or about February 2014, in the Southern District of New York
and elsewhere, KEVIN LOWE, DAVID MOODY, RASHAWN WHIDBEE, a/k/a
"Ra-Ra," ROBERT WILLIAMS, a/k/a "Crusader Rob," DONALD CARR,
a/k/a "Buster," GEORGE BARROW, a/k/a "Coco," BRADLEY MITCHELL,
ELIJAH PINCKNEY, EVELYN WHITE, CEDRIC WHITE, a/k/a "Sin," SHEILA
CARTER, RAVELO MANZANILLO, a/k/a "Grande," JONATHAN HUERTAS,
OLGA MENDOZA DELAROSA, BRYAN RIVERA, SAMANTHA LIVINGSTON,
BRIDGET HIGGINS, DAVID STEWART, a/k/a "Cash Money," a/k/a "Pork
Chop," VOKART ALSAIDI, KENRICK CHANDLER, a/k/a, "Booby," DARRYL
BRATHWAITE, WALEED ALSAIDI, and RONALD CARR, the defendants, and
others known and unknown, conspired to distribute more than five
million pills of the Schedule II controlled substance Oxycodone,
a highly addictive pain medication.

2.    As detailed further below, the operations of the
distribution ring comprised of the defendants and others were
centralized at Astramed, a purported pain management clinic,
with locations at Southern Boulevard (the "Clinic") and
Westchester Avenue in the Bronx, New York (the "Westchester Ave.
Office," and, collectively, "Astramed").  Doctors at Astramed
wrote tens of thousands of medically unnecessary prescriptions

2

for large quantities of oxycodone.   These prescriptions were then filled at pharmacies by co-conspirators who, in turn, resold and distributed these illegitimately and unlawfully obtained oxycodone tablets at significantly inflated prices.

<u>BACKGROUND ON OXYCODONE</u>

3.   Oxycodone, a highly addictive, narcotic-strength opioid is used to treat severe and chronic pain conditions, such as post-operative pain, severe back and orthopedic injuries, as well as pain associated with certain forms of cancer and other terminal illnesses.   Oxycodone can be legitimately obtained from most pharmacies with a prescription written by a treating physician, and is typically dispensed in 5 to 30 milligram tablets to patients.

4.   Every year more than 13 million Americans abuse oxycodone, with the misuse of prescription painkillers such as oxycodone leading to as many as 500,000 annual emergency room visits.   As a result, the distribution of oxycodone is heavily regulated.   For example, prescriptions for oxycodone cannot exceed a 30-day supply, and cannot allow for "refills." Instead, a patient who has exhausted his or her initial prescription must see his or her doctor again each month and be re-evaluated before obtaining a new prescription from the doctor.   Similarly, to curb any potential for abuse, pharmacies are required to track and report all prescriptions filled for

oxycodone, and no patient can fill a prescription for oxycodone more than once every 30 days, even if written by a different doctor.

5.     Oxycodone prescriptions have enormous cash value to drug dealers.  Oxycodone prescriptions can be filled at virtually any pharmacy and the oxycodone tablets can then be resold on the street for thousands of dollars.  For example, thirty milligram oxycodone tablets, which are generally prescribed by the doctors at Astramed, have a street value of $30 to $40 per tablet in New York City, and a value as high as $100 per tablet in other parts of the country, such as Massachusetts, Vermont, and Maine.  In other words, a single prescription for 180 30-milligram tablets of oxycodone can net the distributor as much as $18,000 in cash.

## THE ASTRAMED CONSPIRACY

6.     The defendants charged herein collectively made millions of dollars through a scheme to write and fill tens of thousands of medically unnecessary prescriptions for oxycodone, before reselling those unlawfully obtained pills at high prices to individuals addicted to oxycodone, among others.

7.     Essential to this illegal distribution conspiracy were corrupt, Board certified, state licensed doctors who, in exchange for cash, were willing to write medically unnecessary prescriptions for large quantities of oxycodone (the "Doctors").

The Doctors' fee for their participation in the scheme was typically $300 in cash – at all times relevant to the conduct charged herein, Astramed accepted no form of health insurance – for "doctor visits" that usually lasted just a minute or two, involved no actual physical examination, and consistently resulted in the issuance of a prescription for large doses of oxycodone, typically 180 30-milligram tablets, or a daily dosage of six 30-milligram tablets.  To protect against the possibility of detection by law enforcement, the Doctors sometimes asked the "patients" for medical documentation, such as MRIs, purporting to document injuries, or urine samples purporting to show that the "patient" was taking oxycodone (and thus not obtaining it for the purpose of distribution).  As discussed below, fake MRIs and urine samples were sold by members of the conspiracy to Astramed's "patients," typically inside the Clinic or immediately outside its premises.

       8.   The Clinic itself bears little resemblance to a standard medical office.  *See photographs attached as Exhibit A.* For example, at all times relevant to the conduct charged herein, on a daily basis, crowds of up to one hundred people gathered outside the Clinic, clamoring to see one of the Doctors and thereby get a prescription for oxycodone.  The majority of these individuals had no medical need for oxycodone, or any legitimate medical record documenting an ailment for which

oxycodone would be prescribed.  Instead, most of these individuals were members of "crews" (the "Crew Members") - that is, they were recruited and paid by oxycodone distributors (the "Crew Chiefs") to pose as "patients" in order to receive medically unnecessary prescriptions from the Doctors.

9.    Crew Chiefs provided their Crew Members with the approximately $300 the Clinic charged for the "doctor visit," and after the Crew Member obtained a medically unnecessary oxycodone prescription from one of the Doctors, the Crew Member was then taken or referred by his/her Crew Chief to a pharmacy to fill the oxycodone prescription - that is to obtain the oxycodone tablets - which the Crew Chief would take possession of and ultimately resell.  Crew Members were paid by Crew Chiefs for their services, typically up to $500 for obtaining and handing over the oxycodone tablets they obtained as a result of their visit to the Clinic.

10.   Crew Chiefs also paid the Clinic's employees (the "Office Staff") hundreds of dollars in cash at a time to get their Crew Members into the Clinic to see one of the Doctors.

11.   Not all of the individuals trying to get oxycodone at the Clinic were already part of a Crew.  These other "patients" - who typically were either addicts or drug dealers with no medical need for oxycodone - could gain access to the Clinic only by paying an "admission" fee, which was

typically in excess of $1,000 in cash, in order to be granted
access to the Clinic and to one of its Doctors.  In exchange for
these upfront fees, which were either paid to the Crew Chiefs,
who effectively came to control access to the Clinic, or to
Office Staff, these new "patients" were allowed to see a Doctor
and could thereby obtain an oxycodone prescription and either
use the pills they received themselves or resell them for a
profit, as the case may be.

12.  Both the Crew Chiefs and the Office Staff also
profited by selling fake MRIs or urine samples to these new
"patients," and Crew Chiefs also sometimes purchased oxycodone
pills from these "patients" after they filled their
prescriptions at pharmacies.  These transactions (the sale of
fake MRIs and urine samples, as well as the resale of pills)
often occurred inside the Clinic, or in close proximity to the
Clinic.

13.  In total, between in or around January 2011 and
in or around January 2014, the Clinic issued approximately
31,500 medically unnecessary prescriptions for oxycodone,
comprising nearly 5.5 million oxycodone tablets with a street
value of up to $550 million.

## The Defendants' Participation in the Drug Distribution Conspiracy

14. As discussed in part above, a variety of individuals played distinct roles in the conspiracy, which was centered at the Clinic.

### The "Doctors"

a. At all times relevant to this Indictment, KEVIN LOWE, the defendant, was a licensed medical doctor and the owner and operator of all Astramed locations, including the Clinic and the Westchester Ave. Office. LOWE oversaw the day-to-day operations at both the Clinic and the Westchester Ave. Office, both in person and via a network of surveillance cameras that allowed him to remotely monitor the Clinic. LOWE also hired the Office Staff and the other Doctors who worked at the Clinic. Although LOWE occasionally saw "patients" and wrote medically unnecessary oxycodone prescriptions himself, he also hired other Doctors whom he directed to write oxycodone prescriptions for every patient. In fact, LOWE paid the Doctors based on how many prescriptions they wrote – rather than for every patient seen, procedure performed, or hour worked. That is, LOWE did not pay the Doctors anything if they saw a patient without writing a prescription, regardless of the circumstances.

b. At various times relevant to this Indictment, a co-conspirator not named as a defendant herein ("Doctor-1") was a Doctor at the Clinic. Doctor-1 saw dozens of Crew Members and

8

new "patients" each day at the Clinic.  Typically, Doctor-1
would prescribe a large quantity of oxycodone tablets to each
Crew Member without conducting any medical examination.  Between
June 2012 when Doctor-1 first began working at the Clinic and
January 2014, Doctor-1 wrote more than 17,000 oxycodone
prescriptions, averaging several hundred oxycodone prescriptions
per week, and writing as many as 126 oxycodone prescriptions in
a single day.

### The "Crew Chiefs"

        c.   At various times relevant to this Indictment,
DAVID MOODY, the defendant, was a Crew Chief at the Clinic who
employed dozens of his own Crew Members for the purpose of
obtaining and filling oxycodone prescriptions, which MOODY then
resold for profit.  MOODY also guarded the Clinic's door and
thereby controlled which new "patients" and Crew Members had
access to the back room at the Clinic – i.e., the final waiting
area for "patients" waiting to see a Doctor.  In addition, MOODY
charged new "patients" fees of as much as $1,600 for entry to
the Clinic.

        d.   At various times relevant to this Indictment,
MOODY was assisted by his "son," RASHAWN WHIDBEE, a/k/a "Ra-Ra,"
the defendant, who, among other things, helped MOODY to bring
his Crew Members into the Clinic and thereafter collected

prescriptions written for these Crew Members and caused them to be filled at pharmacies.

        e.  At various times relevant to this Indictment, a co-conspirator not named as a defendant herein ("Crew Chief-1") was a Crew Chief at the Clinic with dozens of his own Crew Members, each of whom was paid to obtain oxycodone prescriptions at the Clinic and to fill them and give the resulting oxycodone tablets to Crew Chief-1 for resale.  Crew Chief-1 recruited his Crew Members by, among other methods, targeting individuals who suffered from HIV/AIDS and other illnesses and who therefore were more likely to have established relationships with pharmacies that could fill prescriptions obtained at the Clinic.

        f.  At various times relevant to this Indictment, ROBERT WILLIAMS, a/k/a "Crusader Rob," the defendant, was a Crew Chief who brought dozens of Crew Members to the Clinic.  In exchange for cash payments, these Crew Members obtained oxycodone prescriptions at the Clinic, which they then filled and provided to WILLIAMS for resale.  WILLIAMS also charged new "patients" hundreds of dollars to gain access to the Clinic in order to see one of the Doctors and obtain an oxycodone prescription.

        g.  At various times relevant to this Indictment, BRADLEY MITCHELL, the defendant, was a Crew Chief who brought dozens of his own Crew Members to get oxycodone prescriptions at

the Clinic, which he then caused to be filled at pharmacies. MITCHELL also guarded the door of the Clinic's back room - i.e., the final waiting area before seeing a Doctor - and charged other Crew Chiefs fees to expedite their own Crew Members' visits to the Doctors.

      h.   At various times relevant to this Indictment, DONALD CARR, a/k/a "Buster," the defendant, was a Crew Chief who brought dozens of his own Crew Members to the Clinic in order to obtain oxycodone prescriptions, which CARR then caused to be filled at a pharmacy so that the resulting pills could be resold.  CARR also charged new "patients" up to $1,600 to gain access to the Clinic and its Doctors.  CARR also sold urine samples to Crew Members working for other Crew Chiefs as well as to new "patients."  As previously described, those urine samples were provided to the Doctors to bolster the legitimacy of the Doctors' prescriptions and ostensibly to insulate the Doctors from criminal exposure.

      i.   At various times relevant to this Indictment, GEORGE BARROW, a/k/a "Coco," the defendant, was a Crew Chief who brought dozens of his own Crew Members to the Clinic, and who also charged new "patients" fees to gain access to the Clinic and its Doctors.  BARROW also sold Crew Members and new "patients" urine samples which would test positive for the presence of oxycodone if analyzed.

j.   At various times relevant to this Indictment, EVELYN WHITE, the defendant, was a Crew Chief who brought dozens of her own Crew Members to the Clinic in order to obtain oxycodone prescriptions, which WHITE then caused to be filled at a pharmacy.  WHITE and her son CEDRIC WHITE, a/k/a "Sin," the defendant, then collected the oxycodone tablets dispensed to her Crew Members for resale.

k.   At various times relevant to this Indictment, SHEILA CARTER, the defendant, was a Crew Chief who brought several of her own Crew Members into the Clinic to obtain oxycodone prescriptions.  CARTER also dispatched her Crew Members to area pharmacies in order to get the prescriptions filled, after which CARTER collected the oxycodone tablets from her Crew Members for resale.  CARTER also obtained and filled prescriptions in her own name, all written by Doctor-1, and redistributed those pills for profit.

l.   At various times relevant to this Indictment, ELIJAH PINCKNEY, the defendant, was a Crew Chief at the Clinic who brought dozens of his own Crew Members to the Clinic in order to obtain oxycodone prescriptions for resale.  PINCKNEY also charged new "patients" as much as $1,600 for access to the Clinic, and charged lesser amounts to permit returning "patients" to skip to the front of the line to see one of the Clinic's Doctors.

12

**The Beacon Crew**

m.   At various times relevant to this Indictment,
VOKART ALSAIDI, KENRICK CHANDLER, a/k/a "Booby," and DARRYL
BRATHWAITE, the defendants, ran a Crew of at least 25 Crew
Members, all of whom saw a Doctor at the Clinic at least once a
month, before being transported by ALSAIDI, CHANDLER, BRATHWAITE
and others to a pharmacy in Beacon, New York where the
prescriptions were filled (the "Beacon Pharmacy").  In addition
to running the Crew, ALSAIDI, CHANDLER, and BRATHWAITE were all
"patients" themselves, and each received prescriptions in their
own names from Doctor-1 or other Clinic Doctors, before filling
the same at the Beacon Pharmacy.  ALSAIDI, CHANDLER, and
BRATHWAITE, among others, then collected the oxycodone tablets
obtained from their own prescriptions and those of their Crew
Members and resold them from their base of operations, an
apartment building on 217th Street in the Bronx, New York (the
"Beacon Crew Building").

n.   At various times relevant to this Indictment,
THEODORE ROOSEVELT JOHNSON, a/k/a "Top," the defendant, was a
senior member of the Beacon Crew, who helped to get the Crew
Members into the Clinic to see a Doctor before collecting and
helping to fill the prescriptions written for these Crew
Members.  As a senior member of the Crew, JOHNSON had direct
ties to the Doctors, including Doctor-1, and was also

13

responsible for taking Crew Members to the Beacon Pharmacy to
fill their prescriptions.

   o. At various times relevant to this Indictment,
WALEED ALSAIDI and RONALD CARR, the defendants, were both senior
members of the Beacon Crew, who helped obtain and distribute
oxycodone tablets for the Crew.  ALSAIDI and CARR were both Crew
Members who obtained oxycodone prescriptions written by Doctor-1
before filling those prescriptions at the Beacon Pharmacy.
ALSAIDI and CARR also engaged in sales of the oxycodone tablets
obtained by the Crew from the Beacon Crew Building.

## The Office Staff

   p. At various times relevant to this Indictment,
BRYAN RIVERA, SAMANTHA LIVINGSTON, and BRIDGET HIGGINS, the
defendants, all held formal titles at the Clinic, typically as
Office Managers.  RIVERA, LIVINGSTON and HIGGINS all used their
roles as Office Staff to control access to the Doctors and to
make money, charging Crew Chiefs cash fees - as high as $1,000 a
day - to allow Crew Members to see the Doctors and obtain
prescriptions.  RIVERA, LIVINGSTON, and HIGGENS all reported
directly to LOWE, keeping LOWE apprised of activities at the
Clinic and collecting the Clinic's formal fee - i.e., the $300
cash payment per "patient."

   q. At various times relevant to this Indictment,
DAVID STEWART, a/k/a "Cash Money, a/k/a "Pork Chop," the

defendant, was a security guard at the Clinic, hired by LOWE. Like many of the Crew Chiefs described above, STEWART used his role as a security guard to control access to the Doctors, charging fees - of $1,000 or more - to new "patients" who sought to gain access to the Clinic, while taking fees in smaller amounts from returning "patients" who wanted to expedite their visits by moving to the front of the line.

### The Manzanillo Crew

        r.   At various times relevant to this Indictment, RAVELO MANZANILLO, a/k/a "Grande," the defendant, operated as a Crew Chief at the Clinic, bringing in his Crew Members and thereafter causing the prescriptions written for those Crew Members to be filled at area pharmacies, and collecting and reselling the resulting oxycodone tablets.  MANZANILLO also purchased thousands of oxycodone tablets from other Crew Chiefs, including EVELYN WHITE, GEORGE BARROW, a/k/a "Coco," Crew Chief-1 and VOKART ALSAIDI, the defendants, among others.  MANZANILLO conducted some of these transactions inside the Clinic itself, primarily operating out of an area referred to by scheme participants as the "Urine Room," which was the only part of the Clinic free from surveillance cameras and intended for the processing of urine samples.

        s.   To run his Crew and conduct these transactions, MANZANILLO relied on the help of others, namely OLGA MENDOZA

DELAROSA and JONATHAN HUERTAS, the defendants.   DELAROSA
assisted MANZANILLO's Crew Members in gaining entrance to the
Clinic and thereafter ushering these Crew Members to area
pharmacies where the prescriptions would be filled and the
oxycodone tablets collected and given to MANZANILLO for resale.
HUERTAS assisted MANZANILLO in the purchase of oxycodone tablets
from other Crew Chiefs.   Operating out of the "Urine Room,"
among other places, HUERTAS conducted transactions on
MANZANILLO's behalf, generally paying between $16 and $18 per
tablet for oxycodone – or approximately $3,000 for a 180 tablet
bottle.   On MANZANILLO's behalf, HUERTAS also purchased unfilled
prescriptions – i.e., the prescription itself – from "patients"
at the Clinic, which MANZANILLO and HUERTAS had the ability to
get filled, even in the absence of the individual for whom the
prescription was written, at cooperative pharmacies.

## STATUTORY ALLEGATIONS

15.   From in or about January 2011 up to and including
in or about February 2014, in the Southern District of New York
and elsewhere, KEVIN LOWE, DAVID MOODY, RASHAWN WHIDBEE, a/k/a
"Ra-Ra," ROBERT WILLIAMS, a/k/a "Crusader Rob," DONALD CARR,
a/k/a "Buster," GEORGE BARROW, a/k/a "Coco," BRADLEY MITCHELL,
ELIJAH PINCKNEY, EVELYN WHITE, CEDRIC WHITE, a/k/a "Sin," SHEILA
CARTER, RAVELO MANZANILLO, a/k/a "Grande," JONATHAN HUERTAS,
OLGA MENDOZA DELAROSA, BRYAN RIVERA, SAMANTHA LIVINGSTON,

BRIDGET HIGGINS, DAVID STEWART, a/k/a "Cash Money," a/k/a "Pork
Chop," VOKART ALSAIDI, KENRICK CHANDLER, a/k/a, "Booby," DARRYL
BRATHWAITE, THEODORE ROOSEVELT JOHNSON, a/k/a "Top," WALEED
ALSAIDI, and RONALD CARR, the defendants, and others known and
unknown, intentionally and knowingly did combine, conspire,
confederate and agree, together and with each other, to violate
the narcotics laws of the United States.

16. It was a part and an object of the conspiracy
that KEVIN LOWE, DAVID MOODY, RASHAWN WHIDBEE, a/k/a "Ra-Ra,"
ROBERT WILLIAMS, a/k/a "Crusader Rob," DONALD CARR, a/k/a
"Buster," GEORGE BARROW, a/k/a "Coco," BRADLEY MITCHELL, ELIJAH
PINCKNEY, EVELYN WHITE, CEDRIC WHITE, a/k/a "Sin," SHEILA
CARTER, RAVELO MANZANILLO, a/k/a "Grande," JONATHAN HUERTAS,
OLGA MENDOZA DELAROSA, BRYAN RIVERA, SAMANTHA LIVINGSTON,
BRIDGET HIGGINS, DAVID STEWART, a/k/a "Cash Money," a/k/a "Pork
Chop," VOKART ALSAIDI, KENRICK CHANDLER, a/k/a "Booby," DARRYL
BRATHWAITE, THEODORE ROOSEVELT JOHNSON, a/k/a "Top," WALEED
ALSAIDI, and RONALD CARR, the defendants, and others known and
unknown, would and did distribute and possess with the intent to
distribute a controlled substance, in violation of 21 U.S.C. §
841(a)(1).

17. The controlled substance that KEVIN LOWE, DAVID
MOODY, RASHAWN WHIDBEE, a/k/a "Ra-Ra," ROBERT WILLIAMS, a/k/a
"Crusader Rob," DONALD CARR, a/k/a "Buster," GEORGE BARROW,

a/k/a "Coco," BRADLEY MITCHELL, ELIJAH PINCKNEY, EVELYN WHITE, CEDRIC WHITE, a/k/a "Sin," SHEILA CARTER, RAVELO MANZANILLO, a/k/a "Grande," JONATHAN HUERTAS, OLGA MENDOZA DELAROSA, BRYAN RIVERA, SAMANTHA LIVINGSTON, BRIDGET HIGGENS, DAVID STEWART, a/k/a "Cash Money," a/k/a "Pork Chop," VOKART ALSAIDI, KENRICK CHANDLER, a/k/a "Booby," DARRYL BRATHWAITE, THEODCRE ROOSEVELT JOHNSON, a/k/a "Top," WALEED ALSAIDI, and RONALD CARR, the defendants, conspired to distribute and possess with the intent to distribute was mixtures and substances containing a detectable amount of oxycodone, in violation of 21 U.S.C. § 841(b)(1)(C).

## OVERT ACTS

18.   In furtherance of the conspiracy, and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about April 2, 2013, in the Bronx, New York, BRADLEY MITCHELL, the defendant, oversaw and controlled the door to the Clinic's back waiting room – the last stop for Crew Members on the "list" to see a Doctor that day – and called out the names of Crew Members before permitting them to enter the back room, even though MITCHELL was not employed at the Clinic.

b.    On or about June 20, 2013, in Farmingdale, New York, LOWE caused a money order that was provided to the Clinic in exchange for a medically unnecessary oxycodone prescription written by Doctor-1 to be deposited into a particular bank account under his control (the "Lowe Bank Account #1") along with approximately 401 other money orders, all of which were made payable to the Clinic, and which had a total face value of approximately $91,850.

c.    On or about February 7, 2013, CEDRIC WHITE, a/k/a "Sin," the defendant, filled a prescription written by Doctor-1 for 180 30-milligram oxycodone tablets at a pharmacy in Scranton, Pennsylvania.

d.    On or about February 27, 2013, CEDRIC WHITE filled another prescription written by Doctor-1 for 180 30-milligram oxycodone tablets at a pharmacy in the Bronx, New York.

e.    On or about June 12, 2013, in the Bronx, New York, EVELYN WHITE and SHEILA CARTER, the defendants, met with CEDRIC WHITE outside the Clinic.  During the meeting, EVELYN WHITE handed CEDRIC WHITE a quantity of U.S. currency, which CEDRIC WHITE took and proceeded to walk into the Clinic, where he paid other members of the conspiracy in connection with the scheme.

f.   On or about July 8, 2013, in the Bronx, New York, DAVID STEWART, a/k/a "Cash Money," a/k/a "Pork Chop," told a law enforcement officer acting in an undercover capacity ("UC-1") that he could get UC-1 an appointment with a Doctor for $1,350 - $1,000 in cash for STEWART along with a $350 money order for the Clinic.  STEWART then went into the Clinic and came back outside with a piece of paper listing UC-1 as a new patient which he handed to UC-1.  STEWART then brought UC-1 into the Clinic and placed him/her on the line to see Doctor-1.

g.   On or about July 8, 2013, in the Bronx, New York, EVELYN WHITE, who is not a Clinic employee, oversaw and controlled Crew Members' access to the Clinic's Doctors.  WHITE also made arrangements to procure urine for a Crew Member waiting in line to see a Doctor.

h.   On or about July 8, 2013, in the Bronx, New York, GEORGE BARROW, a/k/a "Coco," the defendant, facilitated the entry of certain Crew Members into the Clinic in order to see the Doctor.  Each of these Crew Members saw Doctor-1 and received a prescription.  When one of BARROW's Crew Members received a prescription for 150 oxycodone tablets, BARROW escorted the Crew Member back to Doctor-1's private office and demanded that Doctor-1 re-write the prescription for 180 tablets.

i.   On or about July 9, 2013, in the Bronx, New York, Doctor-1 wrote UC-1 a prescription for 180 30-milligram oxycodone tablets.  Doctor-1 conducted no physical examination of UC-1 before prescribing UC-1 the oxycodone tablets.  UC-1 paid $300 in the form of a money order to the Clinic for the "doctor visit."

j.   On or about July 19, 2013, in Queens, New York, LOWE caused a money order that UC-1 provided to the Clinic in exchange for the oxycodone prescription described in paragraph (m), above, to be deposited into the Lowe Bank Account #1, along with approximately 152 other money orders, all made payable to the Clinic, and with a combined value of approximately $45,201.

k.   On or about July 9, 2013, in the Bronx, New York, DONALD CARR, a/k/a "Buster," the defendant, told a law enforcement officer acting in an undercover capacity ("UC-2") that he would get UC-2 an appointment at the Clinic for $1,500. CARR added that the price was so high because UC-2 did not have identification, so CARR would have to pay the Office Staff extra to get UC-2 an appointment with a Doctor.  CARR further added that, as part of his fee, he would indicate on UC-2's paperwork that his/her urine was positive for oxycodone, even though UC-2 had provided no urine sample.

l.   On or about July 9, 2013, in the Bronx, New York, ELIJAH PINCKNEY, the defendant, BARROW, and DONALD CARR all met

21

in the back room of the Clinic.  During the meeting, PINCKNEY,
BARROW, and CARR discussed how poorly the "operation" at the
Clinic was being run, adding that they needed to make changes so
they could get their Crew Members in and out more efficiently.

     m.   On or about July 9, 2013, in the Bronx, New York,
EVELYN WHITE and BARROW each picked up stacks of prescriptions
from the back room at the Clinic and began calling out the names
of their Crew Members, who thereafter collected the
prescriptions in order to fill them at local pharmacies.

     n.   On or about July 10, 2013, in the Bronx, New
York, PINCKNEY asked UC-2 how much he/she had paid to get on the
"list" to see the Doctor.  When UC-2 replied that he/she had
paid $1,500 to DONALD CARR, PINCKNEY gave UC-2 his number and
told UC-2 that he would charge less to get him/her on the
"list."

     o.   On or about July 26, 2013, in Bayside, New York,
KEVIN LOWE, the defendant, caused a new account to be opened at
the same bank as the Lowe Bank Account #1 (the "Lowe Bank
Account #2").  On the same day, LOWE caused approximately
$600,000 to be transferred from the Lowe Bank Account #1 to the
Lowe Bank Account #2.

     p.   On or about August 15, 2013, at the Clinic in the
Bronx, New York, Doctor-1 wrote 126 prescriptions for oxycodone.

q.   In or about July 2013, in the Bronx, New York, BRIDGET HIGGINS, the defendant, accepted hundreds of dollars in cash per day from Crew Chief-1, BARROW, and DAVID MOODY, the defendants, and others, to permit Crew Members and new "patients" to see a Doctor.

r.   In or about October 2013, in the Bronx, New York, ROBERT WILLIAMS, a/k/a "Crusader Rob," the defendant, communicated by telephone with RAVELO MANZANILLO, a/k/a "Grande," the defendant, approximately 57 times in a two-week period regarding, in relevant part, activities at the Clinic. During that same period, WILLIAMS also spoke on multiple occasions by telephone with Crew Chief-1, CARTER and CEDRIC WHITE.

s.   In or about October 2013, in the Bronx, New York, SAMANTHA LIVINGSTON, the defendant, told a confidential source ("CS-1") that she could arrange appointments with a Doctor at the Westchester Ave. Office in exchange for cash.

t.   On or about November 13, 2013, in the Bronx, New York, Crew Chief-1 sent a text message to a co-conspirator not named as a defendant herein ("CC-1"), telling him/her that "I got the script." Later that same day, Crew Chief-1 told another co-conspirator not named as a defendant herein ("CC-2") that he was at a pharmacy and "It cost 650 for him" (meaning the cost in

cash of filling one or more oxycodone prescriptions at the
pharmacy).

u.   On or about November 13, 2013, in Brooklyn, New
York, Crew Chief-1 attempted to sell approximately 150, 30-
milligram oxycodone tablets to a co-conspirator not named as a
defendant herein ("CC-3").  Crew Chief-1 subsequently was found
to be in possession of approximately $2,460 in cash, as well as
the 150 oxycodone tablets described above.

v.   On or about December 19, 2013, in the Bronx, New
York, MOODY brought one or more of his Crew Members to the
Clinic to see Doctor-1, and thereafter collected an oxycodone
prescription written by Doctor-1 in one of the Crew Member's
names.  The same day, RASHAWN WHIDBEE, a/k/a "Ra-Ra," the
defendant, picked up prescriptions written by Doctor-1 for four
other members of MOODY's crew, including a prescription written
in WHIDBEE's own name.

w.   On or about December 19, 2013, in the Bronx, New
York, DONALD CARR brought one or more of his Crew Members to the
Clinic to see Doctor-1, and thereafter collected an oxycodone
prescription written by Doctor-1 in one of the Crew Member's
names.

x.   On or about December 19, 2013, in the Bronx, New
York, BARROW brought three or more of his Crew Members to the
Clinic to see Doctor-1.  All three Crew Members received

24

prescriptions for oxycodone from Doctor-1, which BARROW then collected.

y.    On or about December 20, 2013, in the Bronx, New York, Doctor-1 was met by DONALD CARR, BARROW, MOODY, and others, as Doctor-1 approached the Clinic.  During the encounter, CARR told Doctor-1, in substance, "I don't want to hear no nonsense out of you today."  Doctor-1 then asked CARR, who, as noted, is not a Clinic employee, "Where's the security people?" to which CARR responded: "They already know where you want them to be Doc," adding "The big guy is going to be here." As Doctor-1 then walked into the Clinic, a co-conspirator not named herein ("CC-4"), yelled out "Let me know when you're ready Doc, so we can get this day over quick."

z.    On or about December 23, 2013, in the Bronx, New York, BARROW sold a urine sample to a law enforcement officer acting in an undercover capacity ("UC-3") for $40. BARROW escorted UC-3 to a convenience store located next door to the Clinic, and poured a "urine sample" from a plastic bottle into a cup, which BARROW handed to UC-3.  UC-3 then returned to the Clinic where the cup was accepted as UC-3's "urine sample."

aa.    On or about December 26, 2013, LOWE deposited approximately 708 money orders, into the Lowe Bank Account #2. The money orders, all of which were made payable to the Clinic, had a combined face value of approximately $199,850.

25

bb.    In or about January 2014, in the Bronx, New York, BRYAN RIVERA, the defendant, accepted cash from a confidential source ("CS-2") to permit other individuals to see the Doctor.

### The Manzanillo Crew

cc.  On or about June 25, 2012, in the Bronx, New York, OLGA MENDOZA DELAROSA, the defendant, received a prescription from Doctor-1 for 180 30-milligram oxycodone tablets.  That same day, DELAROSA received another prescription from another doctor for 180 30-milligram oxycodone tablets.

dd.  On or about July 20, 2012, in the Bronx, New York, DELAROSA received a prescription for 360 30-milligram oxycodone tablets from Doctor-1 which she filled the same day at a local pharmacy, paying the pharmacy cash for the oxycodone tablets.

ee.  On or about November 25, 2013, in the Bronx, New York, MANZANILLO and JONATHAN HUERTAS, the defendants, threw two items out the window of a car they were driving.  The items subsequently were determined to be empty pill bottles bearing pharmacy labels which indicated that the bottles had contained oxycodone tablets and been dispensed to persons other than MANZANILLO and HUERTAS pursuant to prescriptions written by Doctor-1.

**The Beacon Crew**

ff.  On or about April 5, 2013, in Beacon, New York, RONALD CARR, the defendant, and two other co-conspirators and members of the Beacon Crew not named as defendants herein ("CC-5" and "CC-6," respectively) filled prescriptions for oxycodone written by Doctor-1 at the Beacon Pharmacy.

gg.   On or about April 10, 2013, KENRICK CHANDLER, a/k/a "Booby," and DARRYL BRATHWAITE, the defendants, traveled from the Beacon Crew Building in the Bronx, New York, to the Beacon Pharmacy in Beacon, New York, where they filled prescriptions for four different members of the Beacon Crew, including WALEED ALSAIDI, the defendant.  CHANDLER and BRATHWAITE thereafter returned with these filled prescriptions to the Beacon Crew Building.

hh.  In or about April 2013, in the Bronx, New York, WALEED ALSAIDI sold oxycodone tablets to a confidential source ("CS-3") in return for cash.

ii.  On or about May 3, 2013, RONALD CARR traveled with others from the Bronx, New York, to the Beacon Pharmacy in Beacon, New York, where he picked up pills obtained pursuant to prescriptions written by Doctor-1 for himself and VOKART ALSAIDI, the defendant.  RONALD CARR then returned to the Beacon Crew Building with the oxycodone tablets.

27

jj.   On or about May 9, 2013, while in the Bronx, New York, BRATHWAITE received a telephone call from CHANDLER. During the call, BRATHWAITE and CHANDLER discussed a particular pharmacy on Long Island that could be used to fill prescriptions obtained from the Clinic, before CHANDLER chastised BRATHWAITE for using a cellular telephone to discuss such matters.

kk.   On or about June 4, 2013, VOKART ALSAIDI, RONALD CARR and another member of the Beacon Crew ("CC-7") traveled from the Bronx, New York, to the Beacon Pharmacy in Beacon, New York, and ALSAIDI waited while CC-7 and CARR each filed prescriptions for oxycodone written by Doctor-1.   ALSAIDI then drove CARR and CC-7 back to the Beacon Crew Building.

ll.   On or about June 4, 2013, in the Bronx, New York, VOKART ALSAIDI and THEODORE ROOSEVELT JOHNSON, a/k/a "Top," the defendant, coordinated the entry of their Crew members into the Clinic to see Doctor-1.

mm.   On or about December 19, 2013, in the Bronx, New York, JOHNSON picked up a prescription written by Doctor-1 in the name of CHANDLER from the Clinic.

nn.   In total, between in or around January 2011 and January 2014, LOWE deposited or caused to be deposited more than $11,800,000.00 derived from the operation of the Clinic into various accounts under his control, including the Lowe Bank Account #1 and the Lowe Bank Account #2.

## FORFEITURE ALLEGATION

19.   As a result of committing the controlled substance offense alleged in Count One of this Indictment, KEVIN LOWE, DAVID MOODY, RASHAWN WHIDBEE, a/k/a "Ra-Ra," ROBERT WILLIAMS, a/k/a "Crusader Rob," DONALD CARR, a/k/a "Buster," GEORGE BARROW, a/k/a "Coco," BRADLEY MITCHELL, ELIJAH PINCKNEY, EVELYN WHITE, CEDRIC WHITE, a/k/a "Sin," SHEILA CARTER, RAVELO MANZANILLO, a/k/a "Grande," JONATHAN HUERTAS, OLGA MENDOZA DELAROSA, BRYAN RIVERA, SAMANTHA LIVINGSTON, BRIDGET HIGGINS, DAVID STEWART, a/k/a "Cash Money," a/k/a "Pork Chcp," VOKART ALSAIDI, KENRICK CHANDLER, a/k/a "Booby," DARRYL BRATHWAITE, THEODORE ROOSEVELT JOHNSON, a/k/a "Top," WALEED ALSAIDI, and RONALD CARR, the defendants, shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853, any and all property constituting or derived from any proceeds the defendants obtained directly or indirectly as a result of the offense and any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of the offense alleged in Count One of this Indictment.

## SUBSTITUTE ASSETS PROVISION

20.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants,

       a.   cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p) to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

    (Title 18, United States Code, Section 853)


_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

KEVIN LOWE, DAVID MOODY, RASHAWN
WHIDBEE, a/k/a "Ra-Ra," ROBERT WILLIAMS,
a/k/a "Crusader Rob," DONALD CARR, a/k/a
"Buster," GEORGE BARROW, a/k/a "Coco,"
BRADLEY MITCHELL, ELIJAH PINCKNEY,
EVELYN WHITE, CEDRIC WHITE, a/k/a "Sin,"
SHEILA CARTER, RAVELO MANZANILLO, a/k/a
"Grande," JONATHAN HUERTAS, OLGA MENDOZA
DELAROSA, BRYAN RIVERA, SAMANTHA
LIVINGSTON, BRIDGET HIGGINS, DAVID
STEWART, a/k/a "Cash Money," a/k/a "Pork
Chop," VOKART ALSAIDI, KENRICK CHANDLER,
a/k/a, "Booby," DARRYL BRATHWAITE,
THEODORE ROOSEVELT JOHNSON, a/k/a "Top,"
WALEED ALSAIDI, and RONALD CARR,

Defendants.

SEALED INDICTMENT

14 Cr.

(21 U.S.C. §§ 846 and 853.)

PREET BHARARA
United States Attorney.

A TRUE BILL

Foreperson.

1/30 '14   FU Indictment order Seal. A/w issued
Pitman, USMJ

Exhibit A

