UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                                                       :
UNITED STATES OF AMERICA                               :        S1 14 Cr. 055 (LGS)
                                                       :
              – v. –                                   :
                                                       :
KEVIN LOWE, et al.                                     :
                                                       :
                         Defendant.                    :
                                                       :
-------------------------------------------------------X


# MEMORANDUM OF LAW IN SUPPORT OF THE
# GOVERNMENT'S MOTION *IN LIMINE*


PREET BHARARA
United States Attorney for the
Southern District of New York,
Attorney for the United States
of America


EDWARD B. DISKANT
TATIANA R. MARTINS
Assistant United States Attorneys
        - Of Counsel -

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                           :
UNITED STATES OF AMERICA                                   :          S1 14 Cr. 055 (LGS)
                                                           :
            – v. –                                         :
                                                           :
KEVIN LOWE, et al.                                         :
                                                           :
                                                           :
                        Defendant.                         :
                                                           :
-----------------------------------------------------------X

## THE GOVERNMENT'S MOTION *IN LIMINE*

      The Government respectfully submits this memorandum of law in support of its motion which seeks a ruling in advance of the trial, scheduled to begin April 13, 2015, permitting the Government to offer evidence of certain prior investigations into a medical practice owned by Kevin Lowe ("Lowe" or the "defendant") as direct evidence of the charged conspiracy and as evidence of the defendant's knowledge and motive with respect to the same.  Specifically, and for the reasons set forth below, the Government seeks to offer evidence at trial regarding:  (1) a 2011 New York State investigation into the defendant and his clinics for insurance fraud associated with patient visits for "pain management" and related oxycodone prescriptions, including statements made by the defendant to state agents as part of that investigation; and (2) a 2011-12 investigation by a private insurance company into the same, along with statements made by the defendant to the insurance company as part of that investigation.  For the reasons that follow, the motion should be granted.

# I.   RELEVANT BACKGROUND

## A.  Offense Conduct

As set forth more fully in the Indictment, which is expressly incorporated herein by reference, the defendant has been charged with operating a fraudulent medical practice known as "Astramed" from at least January 2011 up through his arrest in February 2014.  During that time period, medical doctors employed at Astramed by the defendant, including Robert Terdiman ("Terdiman") and Tomasito Virey ("Virey"),[1] wrote tens of thousands of medically unnecessary prescriptions for "patients" who would typically pay by cash or money order for doctor visits that lasted a matter of minutes and always resulted in the issuance of a prescription for a large number of oxycodone tablets.  The medically unnecessary prescriptions would then be filled and the resulting oxycodone pills be unlawfully distributed.  The defendant, as the owner and operator of Astramed, reaped millions of dollars in profits from these unlawful prescriptions – during the period of the charged conspiracy alone, he earned more than $12 million from purported "pain management" patient visits.

While the defendant ran a series of clinics under the name "Astramed" throughout the New York City area, the criminal conduct giving rise to the Indictment occurred primarily at two locations – an office on Westchester Avenue in the Bronx, at which Virey was one of the primary practitioners (the "Westchester Ave. Office"); and an office ostensibly devoted exclusively to "pain management" located on Southern Boulevard in the Bronx, at which

---

[1] As the Court is aware, Terdiman is charged as a co-defendant in the instant case.   Virey was charged in a separate charging instrument with one count of conspiring to distribute narcotics and one count of conspiracy to commit healthcare fraud as a result of his participation in the scheme described above.  *See* Information 14 Cr. 104 (GBD).  On January 29, 2014, Virey appeared before the Hon. Henry B. Pitman and entered pleas of guilty to both counts.  A copy of the transcript of those proceedings is attached hereto as Exhibit A.  On February 4, 2014, Virey, who was out on bail at the time, died as the result of an apparent oxycodone overdose.

Terdiman was the sole practitioner (the "Clinic").  The criminal scheme detailed in the Indictment is alleged to have begun at the Westchester Ave. Office in or around January 2011, where Virey wrote large numbers of medically unnecessary oxycodone prescriptions each day. The scheme is alleged to have continued at both that Office and at the Clinic, which the defendant opened in June 2012 shortly after hiring Terdiman to be the Clinic's sole practitioner.

While Lowe rarely, if ever, wrote oxycodone prescriptions in his own name, the Government expects to establish that he orchestrated Astramed's unlawful activities and directly benefitted from them.  Through witness testimony as well as documents and records obtained from the defendant's home, office, and computers, the Government expects to establish that the defendant oversaw every aspect of Astramed's business, exercising continuous control over his co-conspirators' day-to-day activities through an extensive system of surveillance cameras installed at the Clinic, which he closely monitored, as well as through daily and weekly conference calls with his staff, during which the defendant was informed about the number of patients being seen, prescriptions being written, and money being generated at the various Astramed locations.  Indeed, the Government expects to establish that the defendant directly and frequently encouraged his employees, including Virey and Terdiman, to continuously increase the number of patients being seen and oxycodone prescriptions being issued, even while being repeatedly informed by his employees of the likelihood of drug diversion and the lack of meaningful controls at his clinics to prevent such diversion of oxycodone into the illegal narcotics market.   The Government also expects to show, through bank records, the millions of dollars in profits the defendant personally reaped from the tens of thousands of oxycodone prescriptions being written by Virey and Terdiman.

### B.  The Insurance Fraud Investigations

In addition to the above, the evidence will also show that the defendant was repeatedly notified of the highly questionable nature of, and dubious medical rationale for, the high volume of oxycodone prescriptions being issued by Astramed's doctors.   In particular, the Government seeks to offer evidence that during the period of the charged conspiracy, the defendant learned of two separate investigations into the number of oxycodone prescriptions being issued by Virey, in particular, one being conducted by New York state officials, the other by a private insurance company whose beneficiaries were patients at the Westchester Ave. Office.   Indeed, in both instances, the defendant was personally involved in the investigations and was fully aware of their nature and scope.

With respect to these investigations, the Government anticipates calling two witnesses: (a) an investigator from the New York State Attorney General's Office (the "NYSAG") who interviewed the defendant as part of the state's investigation into insurance fraud during the period of the charged ("Investigator-1"); and (b) a representative of a private insurance company who also corresponded with the defendant as part of a similar insurance fraud investigation during substantially the same time period ("Representative-1").   Both Investigator-1 and Representative-1 will testify, in general terms, to the nature of their investigations into Astramed and the defendant, which focused on, among other things, the high volume of oxycodone prescriptions and medical tests.   Both Investigator-1 and Representative-1 will also testify about their direct communications with the defendant regarding those investigations and the concerns they had about the high numbers of oxycodone prescriptions being written.

For example, through the testimony of Investigator-1, the Government expects to establish that in early 2011 – *i.e.*, during the period of the charged conspiracy –NYSAG first

began investigating Virey's prescribing habits at the Westchester Ave. Office.  As part of that investigation, NYSAG interviewed the defendant on or about June 16, 2011.  At the interview, NYSAG directly raised concerns about the number of oxycodone prescriptions being written by the defendant's employee Virey.  As documented in the report of that interview, a copy of which is attached as Exhibit B, the defendant informed Investigator-1 that the numbers were driven by the "high demand for pain management" at the Westchester Ave. Office, and represented to Investigator-1 that certain controls, including urine testing, were ostensibly being imposed for the purpose of stemming the unlawful flow of oxycodone.   (Ex. B at 3, 4.)

Similarly, through the testimony of Representative-1, the Government expects to establish that during the same time period – and thus also during the period of the charged conspiracy – private insurance companies also began to investigate what they perceived to be fraudulent practices with respect to "pain management" patients being seen by Virey at the Westchester Ave. Office.   As part of one such investigation, Representative-1 communicated directly with the defendant about the insurer's concerns in late 2011 and early 2012, before ultimately seeking to either recoup back payments to discontinue Astramed entirely.  On January 27, 2012, for example, Investigator-1 wrote to the defendant, as the owner and operator of Astramed, noting issues with Virey and his "prescribing habits in regards to Fidelis members" and sought reimbursement of more than $800,000.[2]   A copy of this letter is attached as Exhibit C.

---

[2] The Government would similarly offer the defendant's own statements to the insurance company during this investigation, including a September 27, 2011 letter in which the defendant sought to explain the high number of patient visits and unusual billing practices, writing that "due to the location of our offices . . . [a] large percentage of our patient population comes from underserved areas, and are therefore exposed to HIV, drug abuse, violence, tobacco dependency, alcohol induced cirrhosis . . . and a litany of other less common afflictions."  A copy of this letter is attached as Exhibit D.

The Government further plans to establish that, after learning of these investigations, the defendant responded not by curtailing the prescribing habits of his employees but instead by converting his pain management practice into an all-cash operation, even opening a new location – i.e., the Clinic – which would handle nothing but "pain management" patients and would accept no insurance.   In this regard, the Government plans to elicit testimony from two additional witnesses, both former Astramed employees, including : (a) a former member of Astramed's office staff  who worked at both the Westchester Ave. Office and the Clinic during the period of the charged conspiracy ("Witness-1"), and (b) a former medical practitioner who worked at one of the Astramed facilities during the period of the charged conspiracy ("Doctor-1").

Through the testimony of Witness-1 and Doctor-1, among others, the Government expects to establish that in early 2011, when the charged conspiracy began – and when Virey was writing up to 100 oxycodone prescriptions each day – the Westchester Ave. Office accepted many forms of insurance, including Medicaid, for "pain management" patients.   However, beginning in early 2012, or shortly after the defendant learned of both investigations, Astramed began requiring "pain management" patients to pay cash, while continuing to accept insurance for most other purposes.  Through their testimony, the Government also expects to establish that in June 2012, and in response to these investigations, the defendant opened a new Astramed location on Southern Boulevard – i.e., the Clinic – which would specialize in "pain management" and which would not take any form of insurance for patient visits.  As such "patients" seeking an appointment at the Clinic, which was to be staffed solely by Terdiman, would have to pay approximately $300 each by cash or money order for their appointment. [3]

---

[3] Virey remained at the Westchester Ave. Office through approximately May 2013. However, as noted above, the Government expects to establish that beginning in approximately

Once opened, the all-cash Clinic to which all "pain management" patients were directed, became a focal point for the charged conspiracy.   Indeed, and as detailed far more thoroughly in the Indictment, from June 2012 through February 2014, Terdiman alone wrote nearly 20,000 oxycodone prescriptions at the Clinic – each in return for  cash payments of $300 or more – netting the defendant over $6 million from that location alone.

## II.   DISCUSSION

### A.  THE GOVERNMENT SHOULD BE PERMITTED TO OFFER EVIDENCE OF THE TWO INVESTIGATIONS

For the reasons detailed below, evidence of the two investigations described above – *i.e.,* evidence of the investigations conducted by the NYSAG and a private insurance company into the "pain management" patient visits and oxycodone prescriptions written at the Westchester Ave. Office, as well as statements made by the defendant during those investigations (the "Investigation Evidence") – should be admitted as direct evidence of the charged conspiracy or, in the alternative, as permissible "other act" evidence relevant to the defendant's knowledge, motive, and intent.

#### 1.  Applicable Law

It is well established that evidence of otherwise uncharged conduct is admissible, without regard to Rule 404(b), when it constitutes intrinsic or direct proof of the charged crimes.  *See, e.g.*, *United States* v. *Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *United States* v *Gonzalez*, 110 F.3d 936,942 (2d Cir. 1997).   Indeed, the Circuit has frequently observed that such evidence "is not considered other crimes evidence under Rule 404(b) if it arose out of the same transaction or

---

February 2012, or shortly after NYSAG and private insurance investigations, the Westchester Ave. location stopped taking insurance for "pain management," and virtually all of Virey's "patients" paid for their appointments by cash or money order.  .

series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *Id.* (internal quotation marks omitted) (quoting *United States* v. *Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997)); *United States* v. *Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.  Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.").  For instance, evidence of otherwise uncharged conduct may be admitted to provide the jury with the complete story of the crimes charged by demonstrating "the context of certain events relevant to the charged offense."  *United States* v. *Inserra*, 34 F.3d 83, 89 (2d Cir. 1994).  *See also* Weinstein's Fed. Evid., § 404.20[2][b] (noting that evidence of other wrongs is admissible without regard to Rule 404(b) where those wrongs "were necessary preliminaries to the crime charged").   In such circumstances, the uncharged crime evidence is appropriately treated as "part of the very act charged," or, at least, proof of that act.  *United States* v. *Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992).

Alternatively, "[o]ther acts" evidence may be admitted under Rule 404(b) where the evidence: (1) is advanced for a proper purpose; (2) is relevant to the crimes for which the defendant is on trial; and (3) has probative value that is not substantially outweighed by any unfair prejudicial effect.  *See United States* v. *Ortiz*, 857 F.2d 900, 903 (2d Cir. 1988) ("[O]ther acts or crimes are admissible under Rule 404(b) to prove matters other than the defendant's criminal propensity").  Rule 404(b)(2) identifies the proper purposes for the admission of other

act evidence, including to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  *Id.*

The Second Circuit takes an "'inclusionary' approach" to the admission of other-act evidence, under which "'evidence of prior crimes, wrongs, or acts is admissible for any purpose other than to show a defendant's criminal propensity,' as long as it is 'relevant to some disputed issue in the trial' and satisfies the probative-prejudice balancing test of Fed. R. Evid. 403." *United States* v. *Brennan*, 798 F.2d 581, 589 (2d Cir. 1986) (citations omitted).  The District Court has broad latitude in determining whether to admit evidence pursuant to Rule 404(b), and its ruling will be reviewed only for abuse of discretion.  *See Inserra*, 34 F.3d at 89.  Indeed, the admission of prior bad acts in conspiracy cases is an area where the "Second Circuit has afforded significant leeway."  *United States* v. *Nektalov*, 325 F. Supp. 2d 367, 371 (S.D.N.Y. 2004) (collecting cases).

And while any evidence offered pursuant to Rule 404(b) is subject to the balancing test set forth in Rule 403, the Second Circuit has long made clear that "other act" evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial.  *See, e.g., United States* v. *Roldan Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *United States* v. *Williams*, 205 F.3d 23, 3334 (2d Cir. 2000); *see also United States* v. *Paulino*, 445 F.3d 211, 223 (2d Cir. 2006); *cf. Costantino* v. *Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ("[B]ecause virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair.").

### 2.  The Investigation Evidence Is Properly Admissible as Direct Evidence of the Conspiracy and to Provide Context

The Investigation Evidence is admissible for two separate and independently sufficient reasons.  *First*, the Investigation Evidence is admissible as direct evidence of the alleged

conspiracy and to provide background for the events alleged in the Indictment. *Carboni*, 204 F.3d 39, 44 (2d Cir. 2000). As an initial matter, the Investigation Evidence provides important "context" for the charged conspiracy and of the sort routinely admitted to "complete the story." *See, e.g.*, *United States* v. *Canales*, 718 F. Supp. 2d 327, 328 (S.D.N.Y. 2010) (admitting evidence of defendant's participation in similar conduct prior to the indictment "as direct evidence of the charged conspiracy" because it was offered "for the purpose of explaining the background of the alleged conspiracy" as well as to "complete the story of the crime charged"); *United States* v. *Mahaffy*, 477 F. Supp. 2d 560, 568 (E.D.N.Y. 2007) (admitting, in insider trader prosecution, evidence of similar uncharged conduct during the period covered by the Indictment); *United States* v. *Avendano*, 2004 U.S. Dist. LEXIS 24080, at *5 (S.D.N.Y. Nov. 30, 2004) (admitting evidence of additional, uncharged narcotics transactions in drug trial as "both inextricably intertwined with the evidence regarding the charged heroin conspiracy and necessary to complete the story of that alleged offense").

Here, as detailed above, the Government expects to establish that the two investigations, both of which occurred during the period of the charged conspiracy and both of which focused, at least in part, on the same conduct giving rise to the charged conspiracy – i.e., unusually high numbers of oxycodone prescriptions being written by Virey, in particular – had two effects essential to "complet[ing] the story" of the charged offense: *first*, the investigations unquestionably brought to the defendant's attention the highly dubious nature of the oxycodone prescriptions being written at the medical practice he was supervising and from which he was profiting. As noted above, Investigator-1 and Representative-1 are both expected to testify that Lowe was not only informed of the investigations, but was interviewed by investigators from

NYSAG in June 2011, and communicated directly with representatives of the private insurance company in 2011 and 2012.

*Second*, the Government expects to establish, through documents and records as well as the testimony of Witness-1, among others, that the investigations prompted the defendant to switch to an all-cash model for "pain management" patients, thereby shielding that suspicious area of the defendant's business from the scrutiny of insurance investigators.   In particular, the Government expects to present evidence that beginning in February 2012 – or almost immediately after the investigations – the defendant began accepting only cash for "pain management" patients seeing Virey, and that in June 2012, the defendant moved almost all "pain management" patients to the new clinic on Southern Boulevard – i.e., the Clinic – where no insurance was ever accepted for patient visits and where much of the charged conduct occurred.

The Investigation Evidence, thus, is not only admissible but is essential to explain and contextualize the defendant's decision to open the Clinic, to direct all "pain management" patients to that Clinic and Dr. Terdiman, and to refuse to take insurance at that location, all core components of the charged conspiracy.  In other words, the Investigation Evidence is necessary to "complete the story" of the charged crime and should be admitted as direct evidence of the charged crime for that purpose.  *See, e.g.*, *United States* v. *Daly*, 842 F.2d at 1388 ("[T]he trial court may admit evidence . . . to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.").

Moreover, the Investigation Evidence is "inextricably intertwined" with the charged conspiracy, insofar as it substantially overlaps in time, substance, conduct, and participants with the charged conspiracy.  These factors, too, weigh strongly in favor of admissibly in this context.

*See, e.g.*, *United States* v. *Chan*, 2002 U.S. Dist. LEXIS 391, at *8-10 (S.D.N.Y. Jan. 13, 2002) (allowing Government to present evidence that the defendant was acting as an illegal bookkeeper at narcotics trial where recorded phone calls included discussion of both the narcotics and bookkeeping conduct); *United States* v. *Batista*, 2009 U.S. Dist. LEXIS 87349 (E.D.N.Y. Sept. 23, 2009) (admitting, in drug case, evidence of additional, uncharged heroin and marijuana dealings because "it involves the same individuals, locations and time period as the charged offense, and thus rose out of the same series of transactions that underlie the charged conduct") *and see Inserra*, 34 F.3d at 89 ("[E]vidence of defendant's participation in double murder admissible to prove firearm possession count because it was 'an integral part of the circumstances surrounding [the illegal weapon possession] and was reasonably necessary to complete the story of the crime'")(citing *United States v. Fortenberry*, 971 F.2d 717, 721 (11th Cir. 1992)).

According, the Investigation Evidence can and should be admitted as direct evidence of the charged conspiracy.

### 3.  The Investigation Evidence Also Is Properly Admissible to Show Motive and Knowledge Pursuant to Rule 404(b)

Alternatively, the Investigation Evidence is admissible pursuant to Rule 404(b) to show the defendant's motive, knowledge, intent and absence of mistake.  *See Ortiz*, 857 F.2d at 903. Here, the Government expects that Lowe's knowledge of the day-to-day activities at the Clinic and, in particular, the unlawful and medically unnecessary nature of the oxycodone prescriptions being generated at the Clinic, are likely to be key issues in dispute, and issues on which the Government will carry the burden at trial.

The Investigation Evidence provides direct evidence of Lowe's knowledge that the high number of oxycodone prescriptions being generated by his doctors were suspect and likely

medically unnecessary.   In particular, the Insurance Evidence establishes that the defendant was aware that multiple entities were investigating the prescribing habits of Virey and generally accusing Astramed of issuing medically unnecessary prescriptions for oxycodone.  Indeed, that evidence will establish that Lowe met with investigators and was explicitly informed of the nature and scope of both investigations.  As such, the Investigation Evidence provides direct evidence that the defendant was not an innocent bystander or far-removed supervisor but instead had direct knowledge of the illegal oxycodone distribution scheme being run out of the Westchester Ave. Office and the Clinic.  *Cf. United States* v. *Gadsden*, 300 Fed. Appx. 108, 110 (2d Cir. 2008) (uncharged crimes properly offered to establish "knowledge" and "intent" in narcotics trial where defendant raised "mere presence" defense); *United States* v. *Jamison,* 299 F.3d 114, 121 n.3 (2d Cir. 2002) (defendant asserting that his "mere presence" at the location of a crime as insufficient to establish guilt "opens the door" to evidence of "other acts" relevant to rebutting such a claim."); *United States* v. *Aminy*, 15 F.3d 258, 260 (2d Cir. 1994) ("Where . . . the defendant does not deny that he was present during a narcotics transaction but simply denies wrongdoing, evidence of other arguably similar narcotics involvement may, in appropriate circumstances, be admitted to show knowledge or intent.").

That evidence will also establish Lowe's response to that information – that is, it will explain his motive and intent in establishing the Clinic and running it as an all-cash business. Rather than curtailing his doctors' prescribing habits when he learned of the investigations, Lowe instead stopped taking insurance for "pain management" patients, and ultimately opened the Clinic, where he concentrated all of his "pain management" patients.  Thus, the Investigation Evidence is thus equally admissible to show the defendant's motive, intent and absence of

mistake in establishing the Clinic, in particular, where such evidence is consistent with the defendant's intentional design.

### 4.        The Investigation Evidence is Not Unduly Prejudicial Under Rule 403

Finally, there is no basis to exclude the Investigation Evidence under Federal Rule of Evidence 403.  First, the proffered evidence is no more sensational than any of the direct evidence concerning the participation by Lowe in the far-reaching oxycodone conspiracy charged in the Indictment.  *See United States* v. *Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (in narcotics case, evidence of prior narcotics transactions admitted where other acts evidence "'did not involve conduct any more sensational or disturbing than the crimes with which [the appellants were] charged'" (quoting *United States* v. *Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990))); *United States* v. *Peters*, 791 F.2d 1270, 1294 (7th Cir. 1986) (evidence is unfairly prejudicial under Rule 403 if it arouses a sense of horror or otherwise produces an emotional response that would cause the jury to base its decision on something other than the evidence).  To the contrary, and as noted above, there is a very substantial overlap between the conduct giving rise to the Investigation Evidence and the charged conspiracy.   Insofar as the evidence suggests additional criminal conduct – namely, a scheme to defraud insurance companies – such conduct is far less significant than the crime with which Lowe is charged, which places him as the largest beneficiary of a massive oxycodone conspiracy that is responsible for distributing over 5 million illegally-obtained oxycodone pills.

Nor is the proffered evidence likely to significantly expand or increase the length of the trial or risk confusing the jury.  As noted above, the Investigation Evidence overlaps in time, substance, and participants with the charged conduct, and the Government would call, at most, two additional witnesses – i.e., Investigator-1 and Representative-1 – to provide testimony about

the state and private insurance investigations as well as Lowe's direct statements made as part of those investigations.

Accordingly, the evidence is properly admissible pursuant to Rule 404(b).

**III.**      **CONCLUSION**

For the reasons set forth above, the Government respectfully requests that its Motion *In Limine* be granted.

Dated:  New York, New York
        March 9, 2015

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By:      _____/s/_____

 Edward A. Diskant / Tatiana R. Martins
 Assistant United States Attorneys
 (212) 637-2294 / 2215

16